SEALED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

FILED

2017 MAR 31  P 3: 54

WILLIAM W. BLEVINS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ex. rel. ERICA BOOGAERTS and CHAD EDWARDS<br><br>    Plaintiffs,<br><br>v.<br><br>VASCULAR ACCESS CENTERS, L.P., et al.<br><br>    Defendants | CIVIL ACTION NO. **17-2786**<br><br>**FILED _IN CAMERA_ AND UNDER SEAL**<br><br>**SECT. N MAG 4** |

## <u>COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES, AND PHYSICIAN SELF-REFERRAL LAWS</u>

Qui Tam Plaintiffs/Relators Erica Boogaerts and Chad Edwards ("Relators"), on behalf of the

United States of America, file this Complaint against Vascular Access Centers, LP ("VAC"),

Vascular Access Center of East Memphis, LLC, Vascular Access Center of Memphis, LLC,

Vascular Access Center of Jacksonville, LLC, Vascular Access Center of Durham, LLC, Vascular

Access Center of Georgia, LLC, Vascular Access Center of Southwest Louisiana, LLC, Vascular

Access Center of Prince George's County, LLC, Vascular Access Center of Southern Maryland,

LLC, Vascular Access Center of D.C., LLC, Vascular Access Center of South Los Angeles, LLC,

Vascular Access Center of New Orleans, LLC, Vascular Access Center of Northshore Louisiana,

LLC, Vascular Access Center of Bolivar County, LLC, Vascular Access Center of Atlantic

County, LLC, Vascular Access Center of Eatontown, LLC, Vascular Access Center of Central

New Jersey, LLC, Vascular Access Center of West Orange, LCC, Vascular Access Center of

Pittsburgh, LLC, Vascular Access Center of Houston, LLC, Main Line Vascular Institute, LLC,

Peripheral Vascular Institute of Philadelphia, LLC (referred to collectively as "Independent Facilities"), Philadelphia Vascular Institute, LLC, and James F. McGuckin, Jr., M.D. (referred to collectively as "Defendants") and allege as follows:

## INTRODUCTION

1.  This is an action to recover damages and civil penalties on behalf of the United States of America arising from illegal medical directorship agreements, self-referrals from physicians, and the request and presentment for payment concerning countless medically unnecessary procedures.

2.  VAC, by way of Dr. McGuckin's orders as Chief Executive Officer and through its majority owned Independent Facilities, employed medical directors for the purpose of concealing, as management fees, illegal payments made primarily to induce these medical directors to refer patients to the Independent Facilities, in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  Defendant VAC, participated in the kickback scheme by recruiting these physicians to serve as medical directors.

3.  Referrals by the medical directors, as well as referrals by physician investors, to Independent Facilities violated the federal physician self-referral law, 42 U.S.C. § 1395nn (commonly referred to as the "Stark Law"), in light of the financial relationship between these medical directors, physician investors, and these Independent Facilities.

4.  Defendants also violated the federal False Claims Act ("federal FCA"), 31 U.S.C. § 3729 *et seq.*  Knowing that they were ineligible for the payments demanded due to violations of the federal Anti-Kickback Statute, these Independent Facilities submitted claims for reimbursement to Medicare, Medicaid, and other federal and state health care programs

related to these illegal patient referrals, and they created or used false records in support of these false claims.

5. In addition to the Anti-Kickback violations addressed above, many of these Independent Facilities fail the "60-40 test", particularly, the "Revenue Test," which requires that no more than 40% of an entity's gross revenues come from referrals or business otherwise generated from investors. 42 C.F.R. § 1001.952(a)(2)(i) and (vi).

6. Defendants further violated the federal FCA when these Independent Facilities continually submitted Medicare and Medicaid claims for medically unnecessary procedures, such as fistulagrams, angiograms and superior vena cavagrams ("SVCgrams").

7. The concern with illegal referral incentive agreements and billing for medically unnecessary procedures is that they interfere with the physician's judgment of what is the most appropriate care for a patient.

8. These illegal kickback arrangements and unwarranted procedures can inflate costs to federal health care programs by causing physicians to overuse or to inappropriately use the services of a particular facility, as well as billing payers for these services.

9. In addition, unlawful incentives may result, and have done so here, in the delivery of inappropriate, medically unnecessary care to federal health care program beneficiaries by inducing the physician to refer patients to a facility providing financial incentives, rather than to another facility offering the best or most appropriate care for that patient.

10. By funneling illegal kickback payments to medical directors, generating more revenue than allowed by referrals from physician investors, and providing medically unnecessary procedures, Defendants were able to lock in lucrative referral sources, and further strengthen its dominance over the healthcare market.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

12. The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the Eastern District of Louisiana.

13. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the acts complained of herein occurred in Jefferson Parish and St. Tammany Parish, Louisiana, within the Eastern District of Louisiana, and Defendants transact the business that is the subject matter of this lawsuit in this District.

14. Under 31 U.S.C. § 3730, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days after the Court receives the Complaint, unless the Government requests to extend the time for intervention and the Relators concur.

15. Immediately upon filing the Complaint, Relators will provide the United States Attorney for the Eastern District of Louisiana and the Attorney General of the United States with a copy of this Complaint and written disclosure of substantially all material evidence and information Relators possess.

## PARTIES

16. **Relator – Erica Boogaerts**.  A resident of St. Tammany Parish, State of Louisiana, and citizen of the United States.  Erica Boogaerts served as Regional Manager for VAC from August 2009 to August 2016.  Her position in the company afforded her access to investors, financials, clinical information, inside company operations, and other confidential

information only provided to a select few.  While employed as Regional Manager, Ms. Boogaerts also had access to confidential VAC electronic drives and reports.

17. **Relator – Chad Edwards**.  A resident of St. Tammany Parish, State of Louisiana, and citizen of the United States.  Chad Edwards served as a Physician Liaison/Business Developer for VAC from June 2012 to July 2016.  His position in the company afforded him access to investors, financials, clinical information, marketing tactics, and other confidential information only provided to a select few.

18. **Defendant – Vascular Access Centers, LP.**  VAC is a Pennsylvania limited partnership with its principal offices in Philadelphia.  VAC provides dialysis access maintenance to its patients, including thrombectomy/thrombolysis, fistulagrams, fistula maturation procedures, vessel mapping, central venous occlusion treatment, complete catheter services, peripheral arterial disease procedures, varicose vein procedures and chronic cerebrospinal venous insufficiency procedures at numerous majority owned locations throughout the country.

19. **Defendant – Vascular Access Center of East Memphis, LLC.**  A Tennessee limited liability company with its principal place of business in Memphis, Tennessee.  This company is majority owned by VAC.

20. **Defendant – Vascular Access Center of Memphis, LLC**.  A Tennessee limited liability company with its principal place of business in Memphis, Tennessee.  This company is majority owned by VAC.

21. **Defendant – Vascular Access Center of Jacksonville, LLC**.  A Florida limited liability company with its principal place of business in Jacksonville, Florida.  This company is majority owned by VAC.

22. **Defendant – Vascular Access Center of Durham, LLC**.   A North Carolina limited liability company with its principal place of business in Raleigh, North Carolina.   This company is majority owned by VAC.

23. **Defendant – Vascular Access Center of Georgia, LLC**.   A Georgia limited liability company with its principal place of business in Macon, Georgia.   This company is majority owned by VAC.

24. **Defendant – Vascular Access Center of Southwest Louisiana, LLC**.   A Louisiana limited liability company with its principal place of business in Lafayette, Louisiana.   This company is majority owned by VAC.

25. **Defendant – Vascular Access Center of Prince George's County, LLC**.   A Maryland limited liability company with its principal place of business in Landover, Maryland. This company is majority owned by VAC.

26. **Defendant – Vascular Access Center of Southern Maryland, LLC.**   A Maryland limited liability company with its principal place of business in Brandywine, Maryland. This company is majority owned by VAC.

27. **Defendant – Vascular Access Center of D.C., LLC.**   A District of Columbia limited liability company with its principal place of business in Washington D.C. This company is majority owned by VAC.

28. **Defendant – Vascular Access Center of Pittsburgh, LLC.**   A Pennsylvania limited liability company with its principal place of business in Pittsburgh, Pennsylvania. This company is majority owned by VAC.

29. **Defendant – Vascular Access Center of South Los Angeles, LLC**.  A California limited liability company with its principal place of business in Downey, California.  This company is majority owned by VAC.

30. **Defendant – Vascular Access Center of New Orleans, LLC**.  A Louisiana limited liability company with its principal place of business in Metairie, Louisiana. This company is majority owned by VAC.

31. **Defendant – Vascular Access Center of North Shore Louisiana, LLC**.  A Louisiana limited liability company with its principal place of business in Covington, Louisiana. This company is majority owned by VAC

32. **Defendant – Vascular Access Center of Bolivar County, LLC**.  A Louisiana limited liability company with its principal place of business in Cleveland, Mississippi.  This company is majority owned by VAC.

33. **Defendant – Vascular Access Center of Atlantic County, LLC**.  A New Jersey limited liability company with its principal place of business in Mays Landing, New Jersey. This company is majority owned by VAC.

34. **Defendant – Vascular Access Center of Eatontown, LLC**.  A New Jersey limited liability company with its principal place of business in Eatontown, New Jersey.  This company is majority owned by VAC.

35. **Defendant – Vascular Access Center of Central New Jersey, LLC**.  A New Jersey limited liability company with its principal place of business in Piscataway, New Jersey. This company is majority owned by VAC.

36. **Defendant – Vascular Access Center of West Orange, LLC.** A New Jersey limited liability company with its principal place of business in Philadelphia, New Jersey. This company is majority owned by VAC.

37. **Defendant – Vascular Access Center of Houston, LLC.** A Texas limited liability company with its principal place of business in Houston, Texas. This company is majority owned by VAC.

38. **Defendant – Philadelphia Vascular Institute, LLC.** A Pennsylvania limited liability company with its principal place of business in Harrisburg, Pennsylvania.

39. **Defendant – Main Line Vascular Institute, LLC.** A Pennsylvania limited liability company with its principal place of business in King of Prussia, Pennsylvania. Upon information and belief, this companies is owned by James F. McGuckin, Jr., M.D. and is managed by VAC.

40. **Defendant – Peripheral Vascular Institute of Philadelphia, LLC.** A Pennsylvania limited liability company with its principal place of business in Philadelphia, Pennsylvania. Upon information and belief, this company is owend by James F. McGuckin, Jr., M.D. and is managed by VAC.

41. **Defendant – James F. McGuckin, Jr., M.D.** A resident of York County, State of Pennsylvania, and citizen of the United States. Dr. McGuckin founded VAC and serves as VAC's Chief Executive Officer. As the CEO, Dr. McGuckin is personally responsible for the policies and procedures in place at VAC that form the foundation of this Complaint. Moreover, Dr. McGuckin, as a physician investor, has personally billed Medicare, Medicaid, and other federal and state health care programs, costing the government to pay millions of dollars in unnecessary medical procedures.

FACTS

**I. Applicable Laws**

**A. The Federal Anti-Kickback Statute**

42. The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person: (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program, or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.  42 U.S.C. §1320a-7b(b)(1) and (2).

43. The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).

44. Violations of the federal Anti-Kickback Statute must be knowing and willful.  42 U.S.C. § 1320a-7b(b)(1).  An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law."  *United States v. Starks*, 157 F.3d 833, 837-38 (11th Cir. 1998).

45. The federal Anti-Kickback Statute has been interpreted to cover any arrangement where *one* purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Greber*, 760 F.2d 68 (3 rd. Cir.), *cert. denied*, 474 U.S. 988 (1985).  Moreover, payments made to physicians to induce referrals, even if also intended to compensate for professional services, violate the Anti-Kickback Statute. *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 2008 U.S. Dist. LEXIS 55432 [*23] (D.C. Cir. 2008).

46. A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

47. Even without conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider from federal health care programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

48. HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. See 42 C.F.R. § 1001.952. However, only those arrangements that precisely meet all the conditions set forth in the safe harbor are afforded safe harbor protection. None of the VAC's arrangements/agreements at issue here meet these safe harbor regulations.

**B. The Stark Law**

49. Section 1877 of the Social Security Act, 42 U.S.C. § 1395nn(a)(1), the Stark Law, prohibits a physician from referring Medicare patients for certain "Designated Health Services" ("DHS"), to an entity with which the physician or the physician's immediate family has a "financial relationship," unless an exception applies.

50. The Stark Law's prohibitions center on the connection between the referring physician and the entity receiving the referral. The term "financial relationship" includes indirect

compensation arrangements between the physician and an entity that furnishes DHS.  See 42 C.F.R. § 411.354(a)(1)(ii).

51. The Stark Law broadly defines "financial relationship" to include ownership and investment interest and compensation agreements that involve any direct or indirect remuneration between a physician and an entity providing DHS.  The Stark Law's exceptions identify specific types of investments and compensation agreements that will not violate its referral and billing prohibitions.

52. For example, compensation paid to a referring physician serving as an employee in a hospital will fall within an exception to the statute if: (1) the employment is for readily identifiable services; (2) the amount of remuneration paid to the physician is consistent with the fair market value of the services provided and is not "determined in a manner that takes into account directly or indirectly the volume or value of any "referrals" by the physician; and (3) the compensation to the physician would be "commercially reasonable" in the absence of any referrals by the physician.  42 U.S.C. § 1395nn(e)(2).  Thus, compensation paid to a physician under an employment agreement that exceeds fair market value, for which no actual services are performed, or which takes into account the volume or value of the referrals or other business generated between the parties, triggers the referral and payment prohibitions of the Stark Law with respect to DHS referred by that physician.

53. In addition to prohibiting certain physician referrals, the Stark Law prohibits health care entities from presenting or causing to be presented any Medicare claim for DHS provided as a result of a prohibited referral.  See 42 U.S.C. § 1395nn(a)(1)(B).  Any entity that collects Medicare payments for DHS rendered pursuant to a prohibited referral must refund all collected amounts.  42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d).

54. Violations of the Stark Law may subject the physician to exclusion from participation in federal health care programs and various financial penalties, including: (a) a civil monetary penalty of $15,000 for each service included in a claim for which the physician knew or should have known that payment should not have been made under Section 1395(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the physician knew or should have known was prohibited.  See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

55. Stark Law violators on both sides of the illegal referral relationship are subject to the sanctions which include denial of payments, refund of claims, and civil monetary penalties of up to $15,000 per DHS based on an improper referral.  42 U.S.C. § 1395nn(g).

**C.  The Federal False Claims Act**

56. The federal False Claim Act ("federal FCA") provides in pertinent part: Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of the act of that person.

**II.  Background of the Vascular Access Centers**

57. Founded by Dr. McGuckin, and through Dr. McGuckin's actions as CEO of VAC, VAC now has one of the largest independent integrated group of vascular access centers in the

country.  Since its inception, VAC has grown to include services in approximately a dozen States and has reached over 160,000 patients.

58. VAC's business has grown by forming Independent Facilities throughout the country, each of which is majority owned by VAC, while minority ownership is offered to physician investors (except for Peripheral Institute of Philadelphia, LLC and Main Line Vascular Institute, LLC.  These entities are owned by Dr. McGuckin and managed by VAC).

**A.  Overview of Vascular Access Centers' Kickback Scheme**

59. VAC, through its Independent Facilities, contract with various physician investors to serve as a medical director.  An Independent Facility's payment to its medical director was directly linked to the number of referrals generated by the physician serving as medical director.

60. For example, in 2011, the VAC facility in Houston, Texas, increased its medical director annual salary from $48,000 per year to $60,000 per year, plus an additional $90,000 per year for "consulting services", in order to coerce its medical director to refer more patients to Vascular Access Center of Houston, LLC.  The medical director provided no services for this increase in pay, and it was understood that this increase was solely for reasons to encourage additional referrals.

61. Additionally, and as another example, one of the VAC facilities in Louisiana, Vascular Access Center of North Shore Louisiana, LLC, has had a medical directorship agreement in place with Northlake Nephrology Institute ("Northlake") since this facility's inception in April 2010.  Despite never providing any of the duties required by the medical directorship agreement, the facility consistently paid Northlake $4,800 per month from April 2010 through present.  Moreover, during an eight-month period, January 2016

through August 2016, the medical directorship agreement had lapsed and the facility continued to pay Northlake its monthly fee without a contract in place.  Eventually, the facility decided to renew Northlake's medical directorship agreement to maintain this source of referrals, despite Northlake's lack of medical directing.

62. Similar to the above, and in an effort to keep the physician investors content and to maintain the level of referrals provided, VAC agreed to decrease its management fee percentage from 18% to 11% in 2015 for the Vascular Access Center of New Orleans, LLC.

63. Aside from these medical directorship matters, Relator, Chad Edwards, was responsible for gauging physician investors satisfaction with VAC and to coerce physician investors to refer more patients.

64. For instance, once VAC had established who the physician investors would be for a new Independent Facility, VAC would issue a pro forma with an inflated rate of either construction, operating capital, or both. However, VAC would list the required capital needed to begin operating as twice as what was actually required.  VAC would then provide half the required capital (along with other investors of less importance), while allowing other physician investors with the capability of referring a substantial number of patients to the new facility to invest via an issued promissory note.  Since the real operating capital was already accounted for, the new VAC facility would never call the promissory note, and the referring physician investor would get a substantial percentage of ownership in the facility without providing any monetary capital.  Realtor, Chad Edwards, is aware of this method to acquire ownership happening at Vascular Access Center of North Shore Louisiana, LLC, and upon information and belief, of its occurrence at other Independent Facilities.

65. VAC would provide Relator, Chad Edwards, with the referral figures for individual physician investors so that during investor meetings, Relator could review how many referrals each investor had sent the previous month to a particular Independent Facility. This was an attempt by VAC to use the other investors to squeeze more referrals out of their partners who were not sending an adequate number of referrals.

66. As additional revenue was generated for the Independent Facilities through constant referrals from the physician investors, the total revenue generated by the physician investors began violating the 40% investor revenue threshold requirement under 42 C.F.R. § 1001.952(a)(2)(i) and (vi).

67. Upon information and belief, Relators are specifically aware that Vascular Access Center of New Orleans, LLC and Vascular Access Center of Houston, LLC received between 50% to 70% of their referrals from physician investors.  Although VAC was aware of this test, VAC would maintain these numbers by not bringing the issue to the investor physicians.

68. Relator, Erica Boogaerts, attended a meeting between Dr. McGuckin, CEO of VAC, and one of the medical directors of Vascular Access Center of New Orleans, LLC, at R'Evolution Restaurant in New Orleans, Louisiana on March 13, 2014, in which the revenue threshold requirement was discussed.  The medical directors were to hire the full-time Interventional Nephrologist into their practice as a loop hole to this issue, yet both parties eventually dismissed the issue as unimportant.

**B. An Overview of Defendants Violations of the Federal False Claim Act.**

69. To increase procedure numbers, VAC, by way of Dr. McGuckin's orders and through its Independent Facilities, would create a treatment loop that would ensure patients were continually placed on their procedure table.

70. During the initial referral, the Independent Facility would perform a fistulagram as ordered by the referring physician.  After completing the fistulagram, the Independent Facility would begin the process of putting patients on a treatment loop by unilaterally and arbitrarily ordering follow-up procedures for the patients.

71. During these follow-up appointments, the Independent Facility would perform another fistulagram – this time, knowing the procedure was not ordered by a referring physician and with no regard to medical necessity.

72. These follow-up appointments continued for the patients, occurring approximately one to three months, with follow-up fistulagram procedures, which could ultimately lead to providing the patient with a thrombectomy.

73. Thrombectomy procedures are very risky procedures that come with higher complication rates than fistulagrams.

74. In addition to this fistulagram, the Independent Facility would also perform a PAD screen at the patient's initial visit to the Independent Facility and every six months thereafter.

75. This initial PAD screen, which entitled a PADnet test – a Medicare/Medicaid billable test – was completed without a physician order, and was billed through a separate entity called Philadelphia Vascular Institute, LLC, an entity owned by Dr. McGuckin.  Such action was done to avoid the perception of self-referring.

76. The purpose of the PAD screen was to ultimately generate additional future revenue for the Independent Facility through angiograms.  In short, the patient was sent to an Independent Facility for a dialysis complication, and would have an unreferred, medically unnecessary billable test performed that was completely unrelated to the initial complaint.

77. If a patient's PAD screen came back positive, the Independent Facility would immediately schedule an angiogram, a procedure that was completed without any physician referral.

78. Upon information and belief, an Independent Facility, on average, performed 10-20 angiograms per month.

79. Upon information and belief, following the angiogram, the Independent Facility would then schedule the patient for a second procedure of the subsequent leg, as well as a follow-up appointment, during which the patient would receive another fistulagram and potentially a PAD screen.

80. If a patient refused to have a procedure scheduled it was VAC's policy to have a physician at the Independent Facility "educate" the patient as to why the patient need this procedure, despite being unreferred.

81. If a patient's PAD screen came back negative, the Independent Facility would continue the treatment loop, providing fistulagrams and continuing PAD screens every six months – in perpetuity with an order from a referring physician.

82. Upon information and belief, an Independent Facility, on average, performed over 100 fistulagrams per month without any physician referral.

83. Subjecting patients to this continuous treatment loop increases the risk of complications. One fistulagram procedure carries risk.  Here, Independent Facilities were often providing five or more fistulagrams to a patient in any given year, thus multiplying the risk exponentially.

84. A fistulagram is a test often used to determine the cause of patient's not being able to receive dialysis through their graft or arterio-venous fistula.  If the vascular access is blocked or otherwise impaired, a patient will not be able to properly receive dialysis

treatment.   Fistulagrams are commonly performed by Interventional Nephrologists, Vascular Surgeons or Interventional Radiologist (physicians who specialize in renal or kidney function) specifically trained to perform interventional procedures on dialysis patients at hospitals or outpatient vascular access centers, such as those provided by Defendants, by inserting a dye into the dialysis access port to analyze whether the access is working properly.

85. The results of the fistulagram should be used by the treating physician to formulate a plan of care for a poorly functioning access port.   Fistulagrams should not be performed on dialysis patients unless there is a medically necessary reason to do so.   Performing unnecessary procedures can result in allergic reactions, breathing complications, bleeding complications and many other complications related to the poor quality of life that many dialysis patients have.   Upon information and belief, physicians, with the knowledge of Defendants, routinely have performed and are performing fistulagrams as "follow-up visits" on patients who have no indication that the fistulagram is medically necessary or proper.

86. Title XVIII of the Social Security Act, Section 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not "reasonable and necessary for the diagnosis or treatment of illness or injury …"  42 U.S.C. § 1395y.  The Centers for Medicare and Medicaid Services ("CMS") routinely publishes guidance materials for healthcare providers concerning reimbursement issues, including Local Coverage Determination ("LCD") guidelines for specific geographic areas regarding appropriate billing and coding procedures.  The LCD for Dialysis (AV fistula and graft) Vascular

Access Maintenance issued for the primary jurisdiction of Louisiana outlines the coverage indication limitations and medical necessity for an fistulagram procedure.

87. The Medicare covered indications (or accepted reasons) for performing a fistulagram for Vascular Access Maintenance on a patient are as follows:

a. Change in physical examination characteristics of the thrill.

b. Elevated venous pressures recorded during hemodialysis (static and dynamic pressures) or measured within the vascular access during a diagnostic study (static pressures).

c. Detection of decreased intra-access blood flow at dialysis.

d. Swollen extremity.

e. Unexplained reduction in dialysis kinetics.

f. Clinical parameters such as prolonged bleeding after needle withdrawal, altered physical examination characteristics of vascular access or thrombosis.

g. Elevated negative arterial pre-pump pressures that prevent increasing to acceptable blood flow.

h. Inability to puncture to perform hemodialysis.

i. Abnormal recirculation values.

j. Stenosis associated with thrombosis.

k. Autogenous fistulae that have failed to mature after 4 to 6 weeks.

l. Inefficient dialysis and access dysfunction (Urea Reduction Ration below 60%. See KDOQI guidelines).

m. Recirculation percentage greater than 10-15%.

n. Development of pseudoaneurysm(s).

o.  Superficial collateral venous channels.

p.  Evidence for in-flow obstruction.

q.  Distal steal syndrome.

88. Vascular or dialysis patients should only receive a diagnostic fistulagram if one of the following three incidents occurs: (1) the dialysis patient has been referred to the vascular access center for a fistulagram by a physician or their dialysis center because of one of the above-listed indications; (2) the dialysis patient complains of experiencing one of the above-listed indications to the nephrologist or other physician at the vascular access center; or (3) during a physical examination of the patient at the vascular access center, the treating nephrologist or other physician discovers one of the above-listed indications and determines that a diagnostic fistulagram is medically necessary.  Upon information and belief, Independent Facilities are performing fistulagrams which are not medically necessary and are billing Medicare for those fistulagrams.

89. Relators know that a review of VAC's patients' medical records would demonstrate that in numerous cases, Independent Facilities performed a fistulagram on a patient even though (1) there was no referral from a doctor or dialysis center requesting the fistulagram, (2) there was no complaint from the patient of any of the approved indications, and (3) the Defendant did not perform a physical exam revealing the presence of any of the approved indications.

90. Defendants were aware that physicians were performing medically unnecessary fistulagrams.

91. In addition to performing fistulagrams, Defendants began to perform SVCgrams to even further increase profits.

92. A SVCgram is a more invasive procedure than a fistulagram and is reimbursed by Medicare at a higher rate.  Because of this, VAC instructed centers to place the patient on the procedure room table and perform the catheter removal under fluoroscopy and perform balloon angioplasty of the vein.

93. Relator, Chad Edwards, specifically recalls a teleconference in 2014 during which, Tanya Ryan, manager of Vascular Access Center of Memphis, LLC, explained to VAC's director of physician liaisons, Ryan Deady, and Margaret Couvillon, manager of Vascular Access Center of New Orleans, LLC, how fistulagrams can be converted to the more lucrative SVCgram procedures.  Following this conference call, Vascular Access Center of New Orleans, LLC began performing SVCgrams at a drastically higher rate in order to increase RVUs/reimbursement.

94. Following any intervention, be it a fistulagram or SVCgram, another follow-up appointment was scheduled for the patient, again without any order from a referring physician, while rescreening the patient for PAD.  This would ensure the cycle continued. Each of these follow-up procedures and PAD procedures were done without a referral from a provider and were knowingly presented to the Government for payment.

95. To ensure patients arrived at their follow-up appointments, these Independent Facilities would pay for patient transport, despite patient access to public transportation.

96. For instance, in March 2015, the Independent Facilities, in total, paid $101,327.47 in cab services, all to guarantee that their patients received continual unreferred, unnecessary medical treatment.

**Count I (All Defendants)**
**Violation of the Federal False Claims Act 31 U.S.C. § 3729(a)**

97. Relators re-allege paragraphs 1 through 91 as though fully set forth herein.

98. Through the acts described above, VAC, by way of Dr. McGuckin's orders and through its Independent Facilities, knowingly presented and caused to be presented to the Government fraudulent claims, records, and statements to obtain reimbursement for DHS, such as fistulagrams, angiograms, and SVCgrams – procedures provided under the Medicare program.

99. The Government, unaware of the falsity of the claims made by Defendants, approved, paid, and participated in payments made by the Government's fiscal intermediaries for claims that otherwise would not have been allowed.

**WHEREFORE**, Relators request the following relief:

A. Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the federal False Claims Act;

B. 25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not;

C. Attorneys' fees, costs, and expenses; and

D. Such other relief as the Court deems just and appropriate.

### Count II (All Defendants)
### Violations of the Federal Anti-Kickback Statute 42 U.S.C. § 1320a-7b(b)

100. Relators re-allege paragraphs 1 through 91 as though fully set forth herein.

101. VAC, by way of Dr. McGuckin's orders and through its Independent Facilities, offered medical directorship agreements that violate the federal Anti-Kickback Statute because payments to these medical directors disguised as directorship fees constitute remuneration offered to induce, or in return for, the referral of business paid for by federal programs, including Medicare or Medicaid.

102. VAC, by way of Dr. McGuckin's orders and through its Independent Facilities, knowingly made excessive payments to medical directors as financial inducement for patient referrals to VAC's majority owned Independent Facilities, which services were paid for by federal programs, including Medicare, Medicaid, etc., in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

103. Through its majority owned Independent Facilities, VAC's illegal kickbacks to medical directors induced improper referrals of services provided to beneficiaries to federally-funded healthcare programs.

104. These medical directorship agreements are not protected under the existing "safe harbor" regulations.

105. Moreover, Independent Facilities provided its patients with transportation services for free, knowing that such a service will likely influence a patient's selection of a particular medical provider.

106. For each of these federal Anti-Kickback Statute violations, Defendants are subject to penalties of up to $50,000 for each improper act, plus damages of up to three times the amount of the improper remuneration at issue.  42 U.S.C. § 1320a-7a(a).

**WHEREFORE**, Relators request the following relief:

A. Judgment against the Defendants in an amount equal to up to three times the amount of the improper remuneration at issue;

B. Imposition of penalties of up to $50,000 for each kickback violation;

C. Attorneys' fees, costs and expenses; and

D. Such other relief as the Court deems just and appropriate.

**Count III (All Defendants)**
**Violations of the Stark Law 42 U.S.C. § 1395nn**

107. Relators re-alleges paragraphs 1 through 91 as though fully set forth herein.

108. Physician Investors had a financial relationship with VAC, through its majority owned Independent Facilities to which the Stark Law applied, namely the illegal, excessive remuneration that VAC, through its majority owned Independent Facilities, paid to the Physician Investors.

109. Physician investors referred Medicare patients for DHS to VAC's majority owned Independent Facilities, entities with which they had a financial relationship, in violation of the Stark Law, 42 U.S.C. § 1395nn.

110. None of the Stark Law's exceptions apply to the illegal financial relationship or referrals between VAC's majority owned Independent Facilities and the Physician Investors.

111. Each referral of a Medicare patient for DHS by a Physician Investor to a VAC majority owned Independent Facility constituted a violation of the Stark Law, 42 U.S.C. § 1395nn.

112. Defendants' claims for Medicare funds related to tainted referrals they received from Physician Investors constituted violations of the Stark Law, 42 U.S.C. § 1395nn.

113. Defendants and Physician Investors, who referred Medicare patients for DHS to VAC majority owned Independent Facilities are subject to liability under the Stark Law, 42 U.S.C. § 1395(a)(1)(A).

**WHEREFORE**, Relators request the following relief:

A. Judgement against the Defendants in an amount equal to a refund of all Medicare claims paid for DHS, that resulted from an illegal referral, pursuant to 42 U.S.C. § 1395nn(g);

B.  Imposition of sanctions against Defendants, including denials of payments, and refunds

of claims pursuant to 42 U.S.C. § 1395nn(g).

C.  Imposition of penalties up to $15,000 for each Stark Law violation.

D.  Attorneys' fees, costs, and expenses; and

E.  Such other relief as the Court deems just and appropriate.

**Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, the Relators hereby demand a trial by jury.

Dated: March 31, 2017                      Respectfully submitted,

                                           CHEHARDY, SHERMAN, WILLIAMS,
                                           MURRAY, RECILE, STAKELUM &
                                           HAYES, LLP


                                           _____
                                           Conrad Meyer (Bar No. 27574)
                                           Preston L. Hayes (Bar No. 29898)
                                           Ryan P. Monsour (Bar No. 33286)
                                           One Galleria Blvd., Suite 1100
                                           Metairie, LA 70001
                                           Phone: 504-833-5600
                                           Fax: 504-833-8080
                                           *Attorneys for Erica Boogaerts and Chad Edwards*